**FILED**

OCT 2 4 2016

Clerk, U.S. District Court
District Of Montana
Helena



# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# BUTTE DIVISION

| | |
|---|---|
| WONDER RANCH, LLC,<br><br>                        Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br>U.S. DEPARTMENT OF<br>AGRICULTURE, acting through the<br>U.S. Forest Service, and Melany<br>Glossa, in her capacity as Supervisor<br>of the Beaverhead-Deerlodge National<br>Forest,<br><br>                        Defendant. | No. CV 14-57-BU-SEH<br><br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND ORDER** |

## INTRODUCTION

This case came on for trial before the Court, sitting without a jury, on July 27, 2016, the Honorable Sam E. Haddon presiding. Plaintiff was represented by Christopher C. Stonebeck, Esq. and John Bloomquist, Esq. Defendants were represented by Mark S. Smith, Esq., Leif M. Johnson, Esq., and Melissa A. Hornbein, Esq. Witnesses were sworn and oral testimony was presented. Exhibits

were offered and received into evidence. Trial concluded on August 4, 2016. The Court conducted a site visit of the subject property on October 10, 2016.

From the record, the Court makes the following:

## FINDINGS OF FACT

### I. The Action

1. Plaintiff, Wonder Ranch, LLC ("Wonder Ranch"), filed this action against the United States; the United States Department of Agriculture, acting through the United States Forest Service ("USFS"); and Melany Glossa (in her official capacity as Supervisor of the Beaverhead-Deerlodge National Forest) (collectively "Defendants"). Wonder Ranch claimed, under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a(a), exclusive ownership and control of the portion of a trail, known as The Indian Creek Trail (the "Trail"), that traverses its real property south of Cameron, Montana. Defendants counterclaimed, asserting the United States and the public hold a prescriptive easement over the Trail as it passes through the Wonder Ranch.

### II. The Setting

2. The Wonder Ranch property is an 80-acre tract of land in the foothills west of the Madison Range, south of Cameron, Montana (the "Property" or "Wonder Ranch Property"). The Property is located at the mouth of the Indian

Creek Canyon. The canyon itself is marked by steep, rocky sidewalls and a narrow bottom that follows Indian Creek, which flows generally southeast to northwest across the Property.

3.     The Trail originates on the CB Ranch ("CB") west of the Property. Trail users traveling east exit the CB Ranch, enter USFS land, and re-enter CB land before reaching the western boundary of the Wonder Ranch. Once on the Property, the Trail crosses to the north side of Indian Creek and meanders across the Property in an easterly direction for approximately one-quarter of a mile before exiting the Property at its eastern border. The Trail then enters a large area of USFS land known as the Lee Metcalf Wilderness (the "Wilderness").

4.     A myriad of outdoor activities, including hiking, camping, fishing, hunting, and horseback riding takes place within the Wilderness. The Trail itself provides a widely and consistently used access point to the Wilderness.

### III.   Trail History

5.     The earliest record of the Trail's existence is a United States Geological Survey map from 1888.[1] This map depicts the Trail exiting Indian Creek Canyon just north of and parallel to Indian Creek, in approximately the same location as where it exists today.

---

[1] Exhibit 502.

6.     The Trail also appears on a map of the Gallatin Forest Reserve published in 1905.[2] Again, the Trail is depicted on the north side of Indian Creek at the mouth of Indian Creek Canyon.

7.     In 1917, Clarence Althouse, a local homesteader, built a sawmill along Indian Creek upstream and to the east of what is now the Wonder Ranch Property. The sawmill ceased operation sometime in the 1920s.

8.     In 1924, the USFS built a "wood road" alongside Indian Creek.[3] This road was used to transport logs and cut timber by horse and wagon from the Gallatin Forest and the Althouse sawmill, out of Indian Creek Canyon, and through what became the Wonder Ranch Property.

9.     As early as 1926, the USFS began issuing grazing permits to two area families, Althouses and Armitages, for grazing allotments on National Forest lands up Indian Creek east of the Property.[4] The most realistic route to reach these allotments was by using the Trail. Both ranchers, for many years, drove thousands of livestock up the Trail to the allotments in early summer and back down the Trail at the end of summer.

---

[2] Exhibit 503.

[3] Exhibit 566 at 4–5.

[4] Exhibit 505 at 76, 164.

-4-

## IV.  The Wonder Patent

10.  In the early 1930s, Helen and Denny Wonder ( "Wonders")
homesteaded the 80-acre tract of land now known as the Wonder Ranch Property.
They cleared timber, built a cabin fence around the cabin yard, did certain road
work, and constructed a bridge across Indian Creek.[5]

11.  On October 1, 1936, the United States patented to Denny Wonder the
Wonder Ranch Property under the Homestead Act of 1862 (the "Wonder Patent").[6]
No easement in favor of the United States over the then-existing Trail was
reserved in the Patent.

12.  Historical evidence supports that the 1930s Indian Creek drainage
community was tight-knit and cooperative. A place where "[e]verybody knew
everybody"[7] and "[e]verybody was friends."[8] At that time, it was customary in the
community to allow one neighbor to cross another neighbor's land when needed,
and to treat the other's property with respect while crossing: e.g., if a gate was

---

[5] Exhibit 2 at 6.

[6] Exhibit 3.

[7] Tr. of Bench Trial vol. 1 of 7 at 184:22–23.

[8] *Id.* at 177:3.

open to leave it open; if a gate was closed to close it again after crossing.

13.     In order to reach the Wonder Ranch Property from the west, Wonders had to cross the Althouse property by way of an access road. They did not ask for permission to do so. Instead, they simply used the road at will because "[y]ou didn't have to [ask permission] . . . it was just known that that's how you did it."[9]

14.     Likewise, Althouses and Armitages did not ask for or receive permission to cross the Wonder Ranch Property by way of the Trail when moving livestock to their grazing allotments. A 1939 grazing map confirmed the Trail as one suitable means for accessing USFS grazing allotments east of the Wonder Ranch Property.[10]

15.     In 1940, the USFS published the Beaverhead National Forest map, which designated the Trail as "Trail #328" and identified and publicized it as part of the National Forest trail system.[11]

## V.     Roth's Ownership

16.     On October 8, 1946, Wonders deeded the Property to Arthur H. Roth ("Roth"). On October 15, 1946, the deed was recorded in Madison County.

---

[9] *Id.* at 173:17–24.

[10] Exhibit 581 at 2.

[11] Exhibit 508.

17.     During Roth's ownership, the USFS continued to issue grazing permits for lands east of the Property. Armitages continued using the Trail to access their allotments during this period without asking for permission to do so.

18.     In 1949, the Althouse family sold their ranch to Jean and Dorothy Etchemendy ("Etchemendys"), who took over the Althouse grazing permits.[12] Etchemendys utilized the Bear Creek Trail, the drainage directly north of Indian Creek, to move cattle onto summer grazing. They, however, continued to use the Trail to bring livestock out in August and to oversee their herd on a weekly basis during the summer months.

19.     Annette McLean, Etchemendys' daughter, testified her family never asked for permission to cross the Wonder Ranch Property because they understood the Trail was public access.[13] She also provided the earliest-in-time testimony (late 1950s) from personal knowledge of the various types of users on the Trail: USFS personnel doing trail work; USFS personnel checking grazing allotments; fisherman—both locals and out-of-staters—hunters; and fellow area ranchers.[14]

20.     An affidavit from Blaine C. Tennis ("Tennis"), former Beaverhead

---

[12] Exhibit 505 at 23.

[13] Tr. of Bench Trial vol. 5 of 7 at 1044:1–3, 18–21.

[14] *Id.* at 1045:1–13, 1046:4–13.

National Forest District Ranger, confirmed USFS maintenance and use of the Trail from 1959 to 1967.[15] Maintenance included: "logging out, limbing and brushing, rock removal and bridge repair."[16] The Trail "was used by National Forest personnel to administer National Forest lands; [by] forest grazing permittees to manage their permitted livestock and by the public to gain access to National Forest lands."[17]

## VI.  Anderson Ownership

21.     On June 20, 1962, Roth deeded the Property to William H. Anderson ("Anderson"). On July 3, 1962, the deed was recorded in Madison County.

22.     Both Armitage and Etchemendy continued to access USFS grazing allotments by way of the Trail throughout Anderson's ownership.

23.     The first of many USFS commercial outfitter permits utilizing the Trail appeared in the record during Anderson's ownership of the Property. These permits granted certain individuals the right to use USFS land east of the Property for various activities, including both guided hunting trips lasting a week to ten days and half-day horseback rides.

---

[15] Exhibit 519.

[16] *Id.*

[17] *Id.*

24.     Kenneth Durham ("Durham") obtained outfitting permits using the Trail for the years 1964–1988.[18] The USFS also granted Roy Reed ("Reed") outfitting permits for a period of time between 1967 and 1984.[19] Both men operated hunting camps on USFS property east of the Wonder Ranch Property. Durham and Reed used strings of pack animals to transport supplies up the Trail to their camps. Both transported clients into camp on the Trail. Neither asked for or received permission to cross the Property.[20]

25.     In 1966, Vergil Lindsey ("Lindsey") became Forest Service District Ranger of the Madison Ranger District. Lindsey, or USFS personnel under his direction, maintained the Trail, including the portion on the Property, from 1967 until his retirement in 1988. Lindsey also used the Trail for recreation during his USFS employment. Even after retirement, Lindsey never asked permission to use the Trail because he "believed the Forest Service had right-of-way on the trail after a hundred years of use."[21]

---

[18] Exhibit 515 at 61–98.

[19] *Id.* at 163–193.

[20] Tr. of Bench Trial vol. 6 of 7 at 1578:23–1579:10 (Durham); Exhibit 515 at 1–2 (Reed).

[21] Tr. of Bench Trial vol. 2 of 7 at 431:22–432:1.

## VII. Hudsons' Ownership

26.     On February 1, 1968, Anderson sold the Wonder Ranch Property to William H. Hudson from Dallas, Texas.

27.     Hudson and his wife, Betty Upton Hudson, bought the Property for the purpose of providing their children, Andrew Case Hudson, James Christian Custis Hudson, and Eugenia Hudson (the "Children"), with an opportunity to live in a rural environment and setting during summer months. The Hudson family ("Hudsons") commonly traveled from Texas to Montana in late June or early July, and departed in late August before school started.

28.     On December 25 of the years 1983, 1984, 1985, and 1986, William and Betty Hudson deeded undivided one-quarter interests in the Property to the Hudson Children. On March 15, 2000, the Children deeded the Property to Wonder Ranch, an entity controlled by Chris Hudson and Eugenia (Hudson) King. The Hudsons, in one form or another, have owned the Property from 1968 to the present.

29.     Over 30 witnesses testified at trial as to their use of the Trail during Hudsons' ownership. This testimony had several overarching themes: (1) the Trail is subject to a variety of year-round recreational use, which is much heavier in the summer and fall than in spring and winter; (2) only a small fraction of Trail users

ever asked for permission to use the portion of the Trail that crossed over the Property; (3) the Hudsons were generally cordial and accommodating to trail users; and (4) apart from one or two isolated incidents, the Hudsons never attempted to interfere with the use of the Trail.

### a. Livestock Use

30.     Shortly after Hudsons acquired the Property, Armitage and Etchemendy switched from raising sheep to cattle. They nevertheless continued using the Trail to drive livestock onto USFS grazing allotments east of the Property.

31.     Nothing in the record suggests the Hudsons deviated from the area custom of using neighbor's property when needed. They did not interfere with or deny access to the ranchers using the Trail. Likewise, Etchemendys and CB allowed the Hudsons to cross CB's property in order to reach the Wonder Ranch Property.

32.     In 1970, Cynthia C. Boomhower bought the former Althouse/Etchemendy ranch and founded CB. CB took over the Etchemendy grazing permit and drove cattle up the Trail to the CB allotment each year until sometime around 1996.[22] CB Ranch later became a dude ranch, offering horseback

---

[22] Exhibit 505 at 13; Tr. of Bench Trial vol. 4 of 7 at 884:1–885:2.

rides up the Trail to guests under USFS outfitting permits.

33.     Sandra Vander Lans, Daughter of Cynthia Boomhower, began using the Trail in 1971 to drive cattle and lead CB dude horseback rides up to the National Forest east of the Property. She used the Trail for some 35 years as a CB guide. Permission from any of the Hudsons for use of the Trail was never sought or obtained.[23]

34.     Christopher Vander Lans has lived and worked at CB since the early 1980s. He testified he also drove livestock and led CB dude rides up the Trail. He also testified he began using the Trail for hunting in the 1960s and that he never asked for permission from the Hudsons to use the Trail because he "[d]idn't feel it was necessary."[24]

35.     Jesse Armitage participated in Armitage Ranch livestock drives from as early as 1950. He continued to help out on the ranch until 1988, the year the ranch was sold to Royce and Sterling Carroll. He testified his father, Bill Armitage, would call the Hudsons yearly to let them know what day he would be driving livestock through the Wonder Ranch Property.[25]

---

[23] Tr. of Bench Trial vol. 4 of 7 at 885:18–21.

[24] *Id.* at 912:8.

[25] Tr. of Bench Trial vol. 1 of 7 at 216:25–217:21.

36.     Stan Klauman operated the Armitage/Carroll Ranch from 1976 to 1992. He drove cattle to grazing allotments located on USFS land by way of the Trail. He testified that before moving livestock, he would call Betty Hudson "[t]o ask permission to go through her property."[26]

37.     The USFS stopped issuing grazing permits that involved use of the Trail for access sometime in the 1990s. The most recent permit for that purpose was issued to CB in 1996.[27] Today, the Trail is no longer used for driving livestock to and from grazing allotments.

### b.     The Elkhorn Ranch

38.     The Elkhorn Ranch (the "Elkhorn") operates a dude ranch on the Gallatin side of the Madison Range. It winters approximately 89–100 horses on property directly south of the Wonder Ranch Property. The Elkhorn drives its herd of horses 30 miles between its dude ranch and its winter pasture twice each year. A portion of the route followed in the drive is on the Trail as it crosses the Wonder Ranch Property.

39.     The USFS issues the Elkhorn crossing permits twice yearly, which authorize the Elkhorn to cross over USFS land during the trip. The record contains

---

[26] *Id.* at 246:25–247:9.

[27] Exhibit 505 at 1.

the Elkhorn's USFS-issued crossing permits for every year from 1989 to 2014.[28] Part of these permits expressly state "Indian Creek" as the required route,[29] while others are silent on route.[30]

40.    Linda Miller, Manager of the Elkhorn from 1989 to present, testified the Elkhorn has used the Trail to drive its horse herd twice a year from 1989 to 2015, that this practice started sometime in the 1960s or 70s, prior to her managing the Elkhorn, and that she has personally participated in about 40 of the drives. She never asked for permission to cross the Wonder Ranch Property because she "assumed we were going down a Forest Service trail."[31]

### c.    Outfitters

41.    The original Indian Creek outfitters' (Reed and Durham) permits were sold and transferred over time to other local outfitters. Those outfitters that maintained hunting camps continued using pack strings to haul in supplies on the Trail. Hudsons did not interfere with the outfitters' use of the Trail at any time during the period of such use.

---

[28] Exhibit 525.

[29] *E.g.*, *id.* at 31.

[30] *E.g.*, *id.* at 66.

[31] Tr. of Bench Trial vol. 5 of 7 at 1150:22–1151:1.

42.    Rob Gallentine outfitted summer horseback riding and fall hunting trips up the Trail from 1978 to 1996 under USFS outfitting permits, typically spending seven days in the mountains each trip. He customarily transported between 20 and 30 people up the Trail per season. He never asked for permission to cross the Wonder Ranch Property because he "believed it was a historic Forest Service trail."[32]

43.    Jeffrey Wingard has owned and operated Wolfpack Outfitters since 1992. Mr. Wingard's wife, Shylea, has helped operate the business since 1998, outfitting hunting trips and horseback rides up the Trail under USFS permits. Both Wingards testified they were never denied access and never asked for permission to use the Trail as it crossed the Wonder Ranch Property because they believed it to be a public access trail.[33]

44.    Since 1998, Tim Beardsley has operated as a USFS-permitted outfitter, and has used the Trail to guide day and overnight trips. He has never sought permission from the Hudsons to use the portion of the Trail that crosses the Wonder Ranch Property.[34]

---

[32] *Id.* at 1248:11–16.

[33] *See id.* at 1227:1–2, 7–10 (Jeffrey), 1280:2–12 (Shylea).

[34] *See* Tr. of Bench Trial vol. 4 of 7 at 971:4–10, 972:17–25.

**d.  USFS Trail Use**

45.    The USFS continues, without interruption, to use and maintain the Trail in the same manner and for the same purposes it has for many years starting before the Hudsons took ownership of the property.

46.    Dale Ragain ("Ragain") worked for the USFS on the Madison Ranger District from 1983 to 2006. Madison District Ranger Mark Petroni ("Petroni") worked for the USFS from 1989 to 2008. Jonathan Klein ("Klein") worked for the Madison Ranger District from 1988 to 2012. Ragain, Petroni, and Klein each and all testified to the USFS doing maintenance on the Trail every year of their respective careers.[35] They also testified about other USFS uses of the Trail such as checking on the use of grazing permits and checking of outfitters' camps for compliance with USFS guidelines. None ever asked for Hudsons' permission to use the Trail.[36]

47.    Tennis and Lindsey both confirmed that the USFS has used and maintained the Trail, including the portion traversing the Wonder Ranch Property, from 1959 until the present day, all without obstruction by Hudsons to such use

---

[35] Tr. of Bench Trial vol. 5 of 7 at 1127:14–1128:14 (Ragain); Tr. of Bench Trial vol. 2 of 7 at 526:22 (Petroni); Tr. of Bench Trial vol. 4 of 7 at 950:15–951:10 (Klein).

[36] Tr. of Bench Trial vol. 5 of 7 at 1127:10 (Ragain); Tr. of Bench Trial vol. 2 of 7 at 523:19 (Petroni); Tr. of Bench Trial vol. 4 of 7 at 953:3 (Klein).

and maintenance.

48.     In summary, the USFS or its personnel never asked for permission to use the Trail on the Property. However, because historical use of the Trail did not involve vehicular traffic, the USFS did seek and secure permission from Hudsons to drive vehicles on the Property.[37]

### e.     Recreational Use

49.     As noted, *supra*, the earliest direct evidence of recreational use of the Trail was from the late 1950s. The record is replete with evidence from that point forward of the Trail's use by recreationists. Substantially all of the individual witnesses previously identified testified to personal use of the Trail for such recreational purposes.

50.     Eugenia King and James Hudson both testified that in the 1970s and 1980s the Trail saw limited recreational use. However, National Forest Trail Registers from 1969 and 1970 show as many as 30 recreational users per month.[38] Likewise, a 1972 Wonder Ranch journal entry describes the Trail as "'busier than the country store today.'"[39] Nothing in the record suggests the Trail's recreational

---

[37] *E.g.,* Tr. of Bench Trial vol. 4 of 7 at 953:4–14.

[38] Exhibit 613.

[39] Exhibit 627.

-17-

use has ceased or even subsided since Hudsons took ownership of the Property.

51.     Dramatic increases in recreational use of the Trail occurred in the 1980s and '90s. In 1986, a trophy elk was shot up Indian Creek, drawing dozens of hunters per day to the Trail during the following hunting seasons. Daily public use of the Trail during the summers and hunting seasons of the 1990s was between 10 and 20 people per day.[40] Testimony at trial established frequent recreational use of the Trail from the 1990s to the present. Some witnesses even reported using the Trail just weeks before the trial.[41] Many of such recreational users are from states other than Montana.

52.     Apart from a very few isolated incidents, the Hudsons never attempted obstruction of recreational users of the Trail, but were friendly and cordial with Trail users. Some Trail users reportedly called Hudsons looking for permission to cross the Property. However, the vast majority never asked.

**f.     Signs**

53.     In the early 1980s, the USFS constructed a major trailhead facility to serve the Trail. As part of this construction project, a sequence of signs was placed along the route from the highway to the start of the Trail. These signs serve to

[40] Tr. of Bench Trial vol. 6 of 7 at 1546:10–17.

[41] *E.g.,* Tr. of Bench Trial vol. 4 of 7 at 882:15, 910:16–18.

-18-

direct the public to the Trail and inform members of the public that the Trail provides public access to National Forest land.[42] Another series of signs directs the public from the trailhead to the Wonder Ranch Property.[43]

54.     In the early 1990s, the USFS posted a sign at the trailhead stating "THIS IS PUBLIC ACCESS ACROSS PRIVATE LAND. PLEASE - STAY ON THE ROAD OR TRAIL TO THE NATIONAL FOREST BOUNDARY."[44]

55.     The Hudsons placed no sign on the Property prior to 1985.[45] In 1985, Hudsons installed two wooden signs near the Trail as it entered the Property. These two signs read: "WONDER RANCH PRIVATE PROPERTY PLEASE STAY ON TRAIL TO FOREST BOUNDARY 1/4 MI."[46]

56.     Sometime in 2007, 2008, or 2009,[47] Wonder Ranch installed signs stating, in relevant part, "ACCESS IS PROVIDED BY GRATUITOUS PERMISSION OF THE LANDOWNER."[48]

---

[42] *E.g.*, Exhibit 546.

[43] *E.g.*, Exhibit 543 at 4.

[44] Exhibit 543 at 34.

[45] Tr. of Bench Trial vol. 4 of 7 at 837:3.

[46] Exhibit 77.

[47] Exactly when these signs were erected is disputed in the record. The Court finds it immaterial whether a sign was erected as early as 2007 or as late as 2009.

[48] Exhibit 77.

57.    In August of 2009, Wonder Ranch installed gates on either end of the Trail as it crosses the Property. These gates have always been unlocked. At one time, Wonder Ranch also installed signs instructing trail users to dismount and lead their horses and to leash their dogs. Hudsons testified most people obeyed the lead and leash signs. However, multiple witnesses testified they paid the signs no mind.[49] Regardless, the lead and leash signs were taken down by Wonder Ranch in less than a month.

58.    Wonder Ranch and the USFS, through respective counsel, exchanged a series of communication in 2009 to 2011 regarding the "gratuitous permission" signs.[50] The USFS requested the signs be removed. Wonder Ranch refused. They remain in place today.

### g.    Easement and Trail Relocation

59.    A long and belabored history of discussions, disputes, disagreements, and controversies is shown by record to have existed among the USFS, Wonder Ranch, and other area landowners concerning easements, land ownership, and the Trail's location. It is also clear that the USFS has endeavored to secure a written easement over the portion of the Trail on the Property since Roth's ownership.

---

[49] *E.g.*, Tr. of Bench Trial vol. 5 of 7 at 1224:25–1225:7.

[50] Exhibit 540, 747, 763.

Several different cash payments were either offered or considered by the USFS and Wonder Ranch Property owners. No written easement was ever secured.

60. As part of efforts to secure a recordable easement, the USFS, Wonder Ranch, and CB negotiated for some time about moving the Trail from its historical location. None of those negotiations materialized. The Trail remains in the same location today as before Hudsons acquired the Property.

61. In 2011, the USFS filed a Statement of Interest with the Madison County Clerk & Recorder. The Statement of Interest asserts the United States "has and claims an EASEMENT for the INDIAN CREEK TRAIL NO. 328 over and across" the Wonder Ranch Property.[51]

62. A survey of the Trail as it passes over the CB Ranch and the Wonder Ranch Property is attached to the Statement of Interest. The survey identifies the claimed easement as 10-feet wide on either side of the Trail on the Property. The 20-foot total width was derived from the standard width where "pack strings would have to pass each other."[52] The Trail across the Property, as it exists today, is approximately two-feet to three-feet wide.

---

[51] Exhibit 65.

[52] Tr. of Bench Trial vol. 3 of 7 at 693:16–21.

From the foregoing, the Court enters its:

## CONCLUSIONS OF LAW

1.      The Court has jurisdiction over the parties and the subject matter of the controversy under 28 U.S.C. §§ 1346(f), 2409a.

2.      The Court has jurisdiction over the parties and the subject matter of the counterclaim under 28 U.S.C. §§ 1345, 2201–02.

3.      Venue lies in the District of Montana, Butte Division, under 28 U.S.C. § 1391, 1402(d) and L.R. 1.2(c)(2), 3.2. The property at issue and a majority of the events and omissions giving rise to the issues presented took place in Madison County.

### I.      Prescriptive Easement

4.      Under Montana law, the elements of a prescriptive easement claim are open, notorious, exclusive, adverse, continuous, and uninterrupted use for the statutory period.[53] Before 1953, the statutory period was ten years. After 1953 to the present, the statutory period is five years.[54] Defendants carried the burden of proving each of these elements by clear and convincing evidence.[55] The

---

[53] *Leichtfuss v. Dabney*, 122 P.3d 1220, 1225 (Mont. 2005).

[54] Mont. Code Ann. § 70-19-401.

[55] *Leichtfuss*, 122 P.3d at 1225.

Defendants have proven the existence of a prescriptive easement for the Trail.

### a. Open and Notorious Use

5. "Open and notorious use" is "a distinct and positive assertion of a right hostile to the rights of the owner and brought to the attention of the owner."[56] Such use gives the owner of the servient estate "'either actual knowledge of the hostile claim, or [be] of such a character as to raise a presumption of notice, or [be] so patent that the owner could not be deceived.'"[57]

6. The Court finds ample clear and convincing evidence of open and notorious use by Defendants and the public. The earliest of such evidence is a 1940 map designating the Trail as USFS Trail #328. Many other maps in the record, from 1940 to the present day, depict the Trail as USFS Trail #328. In the early 1980s, the USFS placed signs all the way from the highway to the Wonder Ranch directing the public to the National Forest boundary by way of USFS Trail #328. Area ranchers, outfitters, and the Elkhorn have all used the Trail for commercial purposes from a date and time preceding issuance of the Wonder Patent to today. In addition, individuals have been using the Trail for recreation

---

[56] *Lemont Land Corp. v. Rogers*, 887 P.2d 724, 726–27 (Mont. 1997) (citing *Downing v. Grover*, 772 P.2d 850, 852 (Mont. 1989)).

[57] *Mildenberger v. Galbraith*, 815 P.2d 130, 134–35 (Mont. 1991) (quoting *Collins v. Thode*, 170 P. 940, 941 (Mont. 1918)).

since at least the late 1950s—with this use having substantially increased in the 1970s, 1980s, and 1990s. USFS personnel also have used the Trail for official duty purposes from the 1920s to the present day. Posted USFS maps and signs, coupled with the extensive use of the Trail through the Wonder Ranch Property by the USFS, ranchers, outfitters, recreationists, and other members of the public, clearly and convincingly established proof of continuous, open and notorious use.

### b. Exclusive Use

7. "Exclusive" means "that the right of the easement claimant rests upon its own foundation, and does not depend upon a like right in any other person."[58] "Because a public prescriptive easement is 'public,' the element of exclusivity is not required in establishing the existence of a public prescriptive easement."[59] This case involved the claim of a public prescriptive easement. Defendants were not required to prove exclusive use.

### c. Continuous and Uninterrupted Use

8. "Continuous and uninterrupted" denotes use not interrupted by an act of the landowner or by voluntary abandonment by the party claiming the right.[60]

---

[58] *Lemont*, 887 P.2d at 727 (citing *Scott v. Weinheimer*, 374 P.2d 91, 95 (Mont. 1962)).

[59] *Hitshew v. Butte/Silver Bow Cty.*, 974 P.2d 650, 654 (Mont. 1999).

[60] *Id.* (citing *Granite Cty. v. Komberec*, 800 P.2d 166, 169 (Mont. 1990)).

The Montana Supreme Court "'has long recognized that "[c]ontinuous use" does not mean constant use; rather, if the claimant used the property in dispute whenever he desired, without interference by the owner of the servient estate, the use was continuous and uninterrupted.'"[61] "Abandonment must be proven with words or acts that indicate a clear intent to abandon."[62] "'The act is the relinquishment of possession and the intent is a manifestation not to resume beneficial use of it.'"[63]

9.  As noted above, the record clearly establishes continuous and uninterrupted use of the Trail by the public from well before the Wonder Patent to today. The USFS itself has been using and maintaining the Trail on a yearly basis from at least 1959 to the present day.

10. Neither the Hudsons nor previous owners of the Property ever undertook any meaningful or substantial action to interrupt the public's and the USFS's use of the Trail. The public has been free to use the Trail whenever its members pleased, and they did so. Out of thousands of users of the Trail from the

---

[61] *Public Lands Access Ass'n v. Board of Cty. Comm'rs of Madison Cty.*, 321 P.3d 38, 46 (Mont. 2014) (quoting *Brown & Brown of MT, Inc. v. Raty*, 289 P.3d 156, 164 (Mont. 2012)).

[62] *Leisz v. Avista Corp.*, 232 P.3d 419, 420 (Mont. 2010) (citing *Renner v. Nemitz*, 33 P.3d 255, 262 (Mont. 2001)).

[63] *Id.* (quoting *Harland v. Anderson Ranch Co.*, 92 P.3d 1160, 1168 (Mont. 2004)).

Wonder Patent to today, only a very limited number of people were in any way inhibited from crossing the Property on the Trail. Any attempt by Wonder Ranch to interrupt use by way of the gratuitous permission signs, gates, or the lead and leash signs temporarily installed around 2009 was wholly ineffective. Not only did many people ignore the signs and use the Trail as they had before, but, as discussed below, a prescriptive easement attached decades before the signs were ever put up.

11. Neither the public nor the USFS abandoned their respective rights to use the Trail across the Property. Although the USFS did engage in prolonged negotiations with the Hudsons to acquire a written easement over the Property, such negotiations do not prove abandonment. The fact the USFS continued to use and maintain the Trail as normal during such negotiations supports the conclusion it never relinquished possession of its claim. The fact the signs directing the public to "Trail #328" never came down during negotiations, likewise, shows a lack of intent to abandon.

**d. Adverse Use**

12. "'To be adverse, the use of the alleged easement must be exercised under a claim of right and not as a mere privilege or license revocable at the pleasure of the owner of the land; such claim must be known to, and acquiesced in

by, the owner of the land.'"[64] Under Montana law, "'adverse use is established by presumption if all other elements of the claim are demonstrated.'"[65] "When the other elements have been established, the burden falls upon the other party to show that the use was permissive."[66]

13.     Defendants have established the elements of open, notorious, exclusive, continuous, and uninterrupted use of the Trail for a time period well-beyond the statutory period. Accordingly, the burden shifted to Wonder Ranch to prove the public's and the USFS's use of the Trail was by permission. Wonder Ranch failed to meet that burden.

14.     Permission to use another's land may be granted expressly or impliedly.[67] Although the evidence showed some individuals sought permission of the Hudsons and their predecessors to use the Trail, it was uncontested that the vast majority of users did not. Not one USFS employee testified to ever having sought permission to enter the Property (other than a few times to park a vehicle). Wonder Ranch has wholly failed to establish the public and the USFS used the

---

[64] *Public Lands Access Ass'n v. Boone and Crocket Club Found.*, 856 P.2d 525, 527 (Mont. 1993) (quoting *Keebler v. Harding*, 807 P.2d 1354, 1356–1357 (Mont. 1991)).

[65] *Rappold v. Durocher*, 849 P.2d 1017, 1020 (Mont. 1993) (quoting *Parker v. Elder*, 758 P.2d 292, 294 (Mont. 1988)).

[66] *Id.* (citing *Garret v. Jackson*, 600 P.2d 1177, 1179 (Mont. 1979)).

[67] *See Rettig v. Kallevig*, 936 P.2d 807, 811 (Mont. 1997).

Trail by express permission.

15.     One form of implied permission recognized in Montana law is "neighborly accommodation."[68] "[L]and use based upon 'mere neighborly accommodation' is not adverse use and cannot ripen into a claim for a prescriptive easement."[69] Montana courts have frequently looked to local customs among neighboring land owners to determine if the use of each other's land is permissive.[70]

16.     The record leaves little room for dispute that one historical use of the Trail was born from neighborly accommodation: moving livestock to and from USFS grazing allotments east of the Property. Ample evidence showed that the Indian Creek community, like other Montana communities, was cooperative and accommodating of neighbors' endeavors. If one neighbor needed to cross another's land, express permission was not sought. The land of another was simply crossed as necessary while remaining respectful of use and by leaving gates open or closed as they were found. Accordingly, none of such neighborly accommodation use, as may have occurred, can be attributed to the historical use

---

[68] *See, e.g.*, *Lyndes v. Green*, 325 P.3d 1225, 1230 (Mont. 2014).

[69] *Id.* (citing *Boone & Crockett*, 856 P.2d at 528).

[70] *See, e.g.*, *id.; Rathbun v. Robson*, 661 P.2d 850, 852 (Mont 1983); *Taylor v. Petranek*, 568 P.2d 120, 123 (Mont. 1977).

of the Trail for purposes of determining the scope and bounds of the easement.

17.     However, it must be recognized that the vast majority of public and USFS use of the Trail was not the product of neighborly accommodation. Implicit in the concept of neighborly accommodation is a reciprocal, mutually beneficial agreement between neighbors. This relationship is nonexistent between Wonder Ranch and recreationists, USFS personnel, outfitters, and the Elkhorn. Hudsons have not shown themselves as entitled to cross Elkhorn property as a trade-off for the Elkhorn's use of the Trail to drive its horses. The Hudsons have not shown themselves to be entitled to cross the properties of the hundreds, if not thousands, of recreationists using the Trail as a *quid pro quo* for recreationists' use the Trail. To claim that all recreationists using the Trail, many of whom come from out of state, are "neighbors" would be pure fantasy.

Although Hudsons occasionally employed local outfitters, there is no contention the Hudsons were entitled to use the outfitters' camps or cross their land because the outfitters used the Trail. Hudsons' use of USFS land east of their property arises not from neighborly accommodation, but from simply being members of the public. Any contrary conclusion would strain the doctrine of neighborly accommodation to the point of absurdity. Trail use as early as the late 1950s and continuing to the present day was not by neighborly accommodation.

18.    "[I]t is well established that a landowner's passive acquiescence to another's use of his land is not evidence of permissive use."[71] The Montana Supreme Court has held:

> Implied acquiescence is not the same as permission. On the contrary, possession has been held to be adverse where possession was with forbearance of the title holder who was aware of another's possession and failed to prohibit it. Therefore, possession may be adverse even though the owner does not interfere with entry and the possessor understands there will be no future interference with his possession.
>
> In 1949 the Minnesota court capsulized the crucial distinction between "acquiescence" and "permission" as it exists with regard to the law of adverse possession: "It must be apparent, therefore, that 'acquiescence' and 'permission' as used in the connection are not synonymous. 'Acquiescence' regardless of what it might mean otherwise, means, when used in this connection, passive conduct on the part of the owner of the servient estate consisting of failure on his part to assert his paramount rights against the invasion thereof by the adverse user. 'Permission' means more than mere acquiescence; it denotes the grant of a permission in fact or a license."[72]

19.    The Hudson family merely acquiesced to the scores of Trail users going across the Property. Hudsons and their predecessors did not impose a condition of permission for others to cross the Property; they did not impose conditions on those crossing the Property; they did not attempt to limit the number of daily users of the Trail. For at least nine months out of the year, the Hudsons

---

[71] *Lyndes*, 325 P.3d at 1230 (citing *Brown & Brown*, 289 P.3d at 162).

[72] *Id.* (quoting *Cremer v. Cremer Rodeo Land and Livestock Co.*, 627 P.2d 1199, 1201 (Mont. 1981) (internal citations omitted)).

have not even been present to give permission should a Trail user seek it. The wooden sign put up by Hudsons does not function as a grant of permission: it merely alerts Trail users to the fact the Trail crosses over private property and to stay on the Trail.

20.     The Hudsons' cordial temperament towards Trail users does not establish some kind of implied permission. The majority of Trail users entered the Property under a claim of right derived from unimpeded and uninterrupted use of the Trail or from common knowledge of such use or the USFS's listing of the Trail as Trail #328 on maps and on signs. Whether the Hudsons waved, said hello, or served them lunch does not change the adverse nature of entering another's land under a claim of right. The Hudsons simply failed to assert any claim of paramount rights against the invasion and use of the Trail by multitudes of adverse users. Only a small percentage of Trail use was by permission. The presumption of adverse use stands.

21.     The prescriptive easement claim by the Defendants on behalf of themselves and the public is proven to exist and to continue to exist. It was established by open, notorious, exclusive, adverse, continuous, and uninterrupted use for the statutory period of 5 years by no later than 1973.

22.     "Since the extent of a servitude is determined by the nature of the

enjoyment by which it is acquired, the width of a prescriptive easement must be limited to the width actually used during the prescriptive period."[73] Under Montana law, "[w]hen defining an easement, a court should consider what is 'reasonably necessary and convenient for the purpose for which it was created.'"[74] The historical uses properly considered during the statutory period are: individual travel by foot; horseback riding; and the trailing of pack strings. An easement adequate and sufficient to accommodate the unimpeded and continued historical use continues to exist today.

## II.    Implied Easement and Public Highway Claims

23.    The Court finds it unnecessary to address the Defendants' alternative theories of an implied easement or a public highway due to the finding of an easement by prescription.

## III.    The Quiet Title Act

24.    In enacting the QTA, Congress consented to the naming of the United States as a party defendant in a civil action "to adjudicate a disputed title to real property in which the United States claims an interest."[75] The QTA applies not

---

[73] *Brown & Brown*, 289 P.3d at 165 (citing Mont. Code Ann. § 70-17-106).

[74] *Id.* (quoting *Clark v. Heirs and Devisees of Dwyer*, 170 P.3d 927, 933 (Mont. 2007)).

[75] 28 U.S.C. § 2409a(a).

only to actions to settle full title ownership, "but also actions to remove any clouds of title, whether legal or equitable."[76]

25.     For this Court to have jurisdiction under the QTA, Wonder Ranch needed to establish the following elements: (1) Wonder Ranch claims right, title, or interest in the real property at issue; (2) the United States claims right, title, or interest in the same property; (3) a dispute exists as to the parties' claimed interests in the property; and (4) the dispute creates a cloud on Wonder Ranch's title.

All four elements of the QTA were established by the evidence: Wonder Ranch claims fee simple in the Property; Defendants claim an easement over the Property; the parties dispute the Defendants' claim; and the Statement of Interest creates a cloud on Wonder Ranch's title. However, because the Defendants do in fact hold a prescriptive easement over the Property, Wonder Ranch is not entitled to relief under the QTA.

**IV.     Wonder Ranch's Equal Access to Justice Act Claim**

26.     To be eligible for an award of attorneys' fees under the Equal Access to Justice Act, Wonder Ranch needed to satisfy the following elements: (1) that the claimant is a "party," meaning that at the time the civil action was filed, the claimant's net worth did not exceed $7,000,000 and it did not have more than 500

---

[76] *Hatter v. United States*, 402 F. Supp. 1192, 1195 (E.D. Cal. 1975).

employees; (2) that the claimant is a "prevailing party;" (3) that the government's position was not "substantially justified;" (4) that no "special circumstances make an award unjust;" (5) that "the requested fees and costs are reasonable;" and (6) "that any fee application be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement."[77]

27.    Wonder Ranch is not a prevailing party. It is not entitled to relief under the Equal Access to Justice Act.

## ORDER

Based on the preceding Findings and Conclusions,

IT IS HEREBY ORDERED, under Mont. Code Ann. § 7-4-2613, the USFS shall replace the Statement of Interest on file with the Madison County Clerk and Recorder with a certified copy of the final judgment in this matter. In accordance with Montana law, the scope and location of the easement are defined and limited to its historical uses during the prescriptive period. These uses included USFS trail maintenance, USFS inspection of hunting camps, hiking, horseback riding, and leading strings of pack animals. The location of the Trail has remained unchanged since before the statutory period of prescription and shall be the officially recorded

---

[77] *See* 28 U.S.C. § 2412(d); *Comm'r, I.N.S.* v. *Jean,* 496 U.S. 154, 158 (1990); *United States* v. *Milner,* 583 F.3d 1174, 1196 (9th Cir. 2009).

location of the easement across the Property.

IT IS FURTHER ORDERED that Defendants are entitled to such costs as are authorized by law.

IT IS FURTHER ORDERED that the Clerk of Court shall notify the parties of the making of this Order.

IT IS FURTHER ORDERED that the Clerk of Court enter judgment by separate document in favor of the Defendants, dismissing Plaintiff's claims with prejudice.

DATED this 24th day of October, 2016.

SAM E. HADDON
United States District Judge